**Case No. 24-2979**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE NINTH CIRCUIT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | D.C. No. 3:22-cr-00276-JSC-1 |
| | ) | Northen District of California |
| Plaintiff-Appellee; | ) | |
| | ) | |
| v. | ) | |
| | ) | The Honorable  Jacqueline Scott |
| **ALLEN GESSEN,** | ) | Corley, United States District |
| | ) | Judge |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

**APPELLANT'S OPENING BRIEF**

James S. Thomson
California SBN 79658
Attorney and Counselor at Law
732 Addison Street, Suite A
Berkeley, California 94710
Tel: (510) 525-9123
Fax: (510) 525-9124
Email: james@ycbtal.net

Attorney for Defendant-Appellant
ALLEN GESSEN

1

**TABLE OF CONTENTS**

I.    JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.   CUSTODY STATUS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.  ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.  STATEMENT OF THE CASE AND FACTS. . . . . . . . . . . . . . . . . . . . . 9

      A.     Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      B.     Trial Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

V.    SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

VI.  STANDARDS OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VII. ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

      A.     The Government Did Not Introduce Sufficient Evidence to
             Prove Murder-for-Hire. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            1.    Mr. Gessen Did Not Agree to Hire Someone to Kill. . . . . . . 26

            2.    A Hitman Did Not Receive Pecuniary Value. . . . . . . . . . . . . 32

      B.     The Court Erred in Denying the Motions for Acquittal. . . . . . . . . 33

            1.    The Motions Should Have Been Granted. . . . . . . . . . . . . . . . 33

            2.    There Was Insufficient Evidence Presented that
                Mr. Gessen Agreed to Commit Murder-for-Hire. . . . . . . . . . 35

            3.    There Was No Agreement Between a Solicitor
                and a Hitman Who Received Pecuniary Value. . . . . . . . . . . . 38

C. The Court Erred in Allowing Agent Rizzo to Testify as to His Understanding of Mr. Gessen's Statements and to his Thoughts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

D. The Court Erred in Denying A New Trial Based on the Improper Testimony of Agent Rizzo . . . . . . . . . . . . . . . . . . . . . . . 50

E. The Court Erred in Admitting Evidence of Mr. Gessen Taking His Son to the United States . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

F. The Court Erred in Admitting Evidence of Mr. Gessen Taking His Son to Canada and the Resulting Parental Kidnapping Charge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

G. The Prosecutor Erred In Accusing Trial Counsel of Helping Mr. Gessen with His Testimony . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

H. The Court Erred in Declining to Give A Theory of Defense Jury Instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

I. The Government Failed to Prove Venue and the Court Erred in Not Giving the Defense Venue Instruction and Not Granting a New Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

  1. The Trial Court Erred in Not Giving the Venue Instruction . 69

  2. The Trial Court Erred in Denying a New Trial. . . . . . . . . . . . 72

J. The Cumulative Errors Require Reversal . . . . . . . . . . . . . . . . . . . . . 74

VIII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

STATEMENT OF RELATED CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

CERTIFICATE OF WORD COUNT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Arizona v. Fulminante,* 499 U.S. 279 (1991). . . . . . . . . . . . . . . . . . . . . . . . . 61

*Cooper v. Sanders,* 837 F.2d 284 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . 74

*Darden v. Wainwright,* 477 U.S. 168 (1986). . . . . . . . . . . . . . . . . . . . . . 67, 68

*Jackson v. Virginia,* 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . 24, 34

*Michelson v. United States,* 335 U.S. 469 (1948) . . . . . . . . . . . . . . . . 24, 62, 63

*United States v. Alvirez,* 831 F.3d 1115 (9th Cir. 2016) . . . . . . . . . . . . . . . . . 24

*United States v. Auernheimer,* 748 F.3d 525 (3d Cir. 2014) . . . . . . . . . . . . . . 73

*United States v. Burton,* 410 F.3d 1100 (9th Cir. 2005) . . . . . . . . . . . . . . . 69, 70

*United States v. Carpenter,* 923 F.3d 1172 (9th Cir. 2019). . . . . . . . . . . . . . . 25

*United States v. Castagana,* 604 F.3d 1160 (9th Cir. 2010) . . . . . . . . . . . . . . . 25

*United States v. Chong,* 419 F.3d 1076 (9th Cir. 2005) . . . . . . . . . . . . . . . 32, 68

*United States v. Cortes,* 757 F.3d 850 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . 69

*United States v. Cox,* 963 F.3d 915 (9th Cir. 2020). . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Daane,* 475 F.3d 1114 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . 25

*United States v. De la Fuente,* 8 F.3d 1333 (9th Cir. 1993) . . . . . . . . . . . . . . . 28

*United States v. DeGeorge,* 380 F.3d 1203 (9th Cir. 2004) . . . . . . . . . . . . . 63, 64

*United States v. Delpit,* 94 F.3d 1134 (8th Cir. 1996). . . . . . . . . . . . . . . . 48, 71, 73

*United States v. Earls,* 42 F.3d 1321 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . 48

*United States v. Escobar de Bright,* 742 F.2d 1196 (9th Cir. 1984) . . . . . . . . 69, 72

*United States v. Foster,* 711 F.2d 871 (9th Cir. 1983). . . . . . . . . . . . . . . . . . 66, 67

*United States v. Frampton,* 382 F.3d 213 (2d Cir. 2004) . . . . . . . . . . . . . 26, 28, 32

*United States v. Freeman,* 498 F.3d 893 (9th Cir. 2007). . . . . . . . . . . . . 50, 51, 56

*United States v. Freeman,* 730 F.3d 590 (6th Cir. 2013). . . . . . . . . . . . . . 49, 52, 55

*United States v. Ghanem,* 993 F.3d 1113 (9th Cir. 2021) . . . . . . . . . . . . . . . . . 73

*United States v. Grinage,* 390 F.3d 746 (2nd Cir. 2004). . . . . . . . . . . . . . . . . . 50

*United States v. Haines,* 803 F.3d 713 (5th Cir. 2015) . . . . . . . . . . . . . . . 49, 52, 55

*United States v. Hardwick,* 523 F.3d 94 (2nd Cir. 2008) . . . . . . . . . . . . . . . 27, 32

*United States v. Hawkins,* 934 F.3d 1251 (11th Cir. 2019). . . . . . . . . . . 48, 49, 55

*United States v. Hernandez,* 141 F.3d 1042 (11th Cir. 1998) . . . . . . . . . 27, 70, 71

*United States v. Keller,* 902 F.2d 1391 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . 28

*United States v. Kincaid-Chauncey,* 556 F.3d 923 (9th Cir. 2009). . . . . . . . . 32, 33

*United States v. King,* 660 F.3d 1071,1076 (9th Cir. 2011) . . . . . . . . . . . . . . . 25

*United States v. Lague,* 971 F.3d 1032 (9th Cir. 2020). . . . . . . . . . . . . . . . . . . 25

*United States v. Liew,* 856 F.3d 585 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . . 25

*United States v. Lopez,* 484 F.3d 1186 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . 70

*United States v. Lozoya,* 982 F.3d 648 (9th Cir. 2020) . . . . . . . . . . . . . . . . . . 25

5

*United States v. Necoechea,* 986 F.2d 1273 (9th Cir. 1993) . . . . . . . . . . . . . . . 75

*United States v. Nevils,* 598 F.3d 1158 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . 34

*United States v. Noah,* 475 F.2d 688 (9th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . 69

*United States v. Pace,* 315 F.3d 344 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . 71, 72

*United States v. Peoples,* 250 F.3d 630 (8th Cir. 2001) . . . . . . . . . . . . . . . . . 48, 52

*United States v. Phillips,* 929 F.3d 1120 (9th Cir. 2019) . . . . . . . . . . . . . . . . 26, 32

*United States v. Plunk,* 153 F.3d 1011 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . 48

*United States v. Preston,* 873 F.3d 829 (9th Cir. 2017) . . . . . . . . . . . . . . . . . . . 60

*United States v. Richeson,* 338 F.3d 653 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . 27

*United States v. Ritter,* 989 F.2d 318 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Rodriquez,* 971 F.3d 1005 (9th Cir. 2020) . . . . . . . . . . . . . . . . . 24

*United States v. Santiago,* 46 F.3d 885 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . 66

*United States v. Sarkisian,* 197 F.3d 966 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . 24

*United States v. Tomsha-Miguel,* 766 F.3d 1041 (9th Cir. 2014) . . . . . . . . . . . . 67

*United States v. Torralba-Mendia,* 784 F.3d 652 (9th Cir. 2015) . . . . . . . . . . . . 48

*United States v. Vera,* 770 F.3d 1232 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Washington,* 318 F.3d 845 (8th Cir. 2003) . . . . . . . . . . . . . . . . 28

*United States v. Weatherspoon,* 410 F.3d 1142 (9th Cir. 2005) . . . . . . . . . . . . . 67

*United States v. Wicklund,* 114 F.3d 151 (10th Cir. 1997) . . . . . . . . . . . . . . . . . 27

6

*United States v. Winn,* 577 F.2d 86 (9th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . 68

*United States v. York,* 572 F.3d 415 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Young,* 470 U.S. 1 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

**FEDERAL STATUTES**

18 U.S.C. § 1958 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. § 3237 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fed. R. Crim. P. 18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Fed. R. Evid. 404(b)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 56

Fed. R. Evid. 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Fed. R. Evid. 704(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

## I.      JURISDICTION

Defendant-appellant, Allen Gessen, appeals the April 26, 2024 judgment following a jury trial.  1-ER-2.  Mr. Gessen was sentenced to 120 months in prison plus three years of supervised release.  *Id*.  The district court had jurisdiction under 18 U.S.C. §3231.

Mr. Gessen appealed on May 9, 2024.  8-ER-1471.  This Court has jurisdiction under 28 U.S.C. §1291.

## II.     CUSTODY STATUS

Mr. Gessen is in custody at the FCI, Fort Dix, New Jersey.  He is eligible for release on September 5, 2030.

## III.    ISSUES PRESENTED

Whether the government introduced sufficient evidence to prove murder-for-hire.

Whether the court erred in denying the motions for acquittal.

Whether the court erred in allowing Agent Rizzo to testify as to his understanding of Mr. Gessen's statements and to his thoughts.

Whether the court erred in admitting evidence of Mr. Gessen taking his son to the United States in 2019 and Canada in 2021, and in admitting the 2021 parental kidnapping charge.

Whether the court erred in denying a new trial based on the improper testimony of Agent Rizzo.

Whether the prosecutor erred in accusing trial counsel of helping Mr. Gessen with his testimony.

Whether the court erred in declining to give the theory of defense jury instruction.

Whether the government failed to prove venue and whether the court erred in denying a new trial based on improper venue and erred in not giving a modified venue jury instruction.

Whether the cumulative errors require reversal.

## IV. STATEMENT OF THE CASE AND FACTS

### A. Procedural History

On July 26, 2022, a grand jury returned an indictment charging Allen Gessen with engaging in murder-for-hire between June 2 and July 26, 2022 in violation of 18 U.S.C. § 1958. 3-ER-330. Mr. Gessen plead not guilty. 3-ER-308.

On May 1, 2023, the jury trial began. 2-ER-194.

On May 4, 2023, Mr. Gessen made an oral motion for acquittal. 6-ER-965-966. The court denied the motion. *Id.* at 967. The government rested that same

day. *Id.* at 967-968.

On May 8, 2023, Mr. Gessen was found guilty. 2-ER-152.

On August 2, 2023, Mr. Gessen filed pro se motions for acquittal and for a new trial. 2-ER-101. On January 16, 2024, the court denied the motions. 2-ER-15.

On April 24, 2024, Mr. Gessen was sentenced to 120 months in prison plus three years of supervised release. E-ER-11.

On May 9, 2024, Mr. Gessen filed a notice of appeal. 8-ER-1471.

## B.    Trial Proceedings

### David Rizzo

FBI Agent David Rizzo worked in an "undercover sensitive operations unit." 4-ER-566. He portrayed an "organized crime figure to an Italian organized crime syndicate" and "a money launderer for the Columbian drug cartel." He testified as a lay witness.

Rizzo was conducting a money laundering investigation of Aleksei Kiselev. *Id.* at 567. Kiselev knew Mr. Gessen.

In March 2022, Kiselev met Rizzo to discuss overseas business investments. During the discussion, Kiselev asked Rizzo about bribing an immigration official to deport Mr. Gessen's partner, Priscilla Chigariro. 4-ER-569-573. Rizzo quoted

10

Kiselev $100,000 for the bribe. *Id.* at 572.

On June 2, 2022, Mr. Gessen contacted Rizzo. They met that day in Boca Raton, Florida. 4-ER-577. They first discussed Ukranian investment opportunities. *Id.* at 592, 610. Rizzo then informed Mr. Gessen that the first "installment" for the deportation plan would be $25,000. *Id.* at 585. Rizzo instructed Mr. Gessen to deposit the money into an identified account. *Id.* at 594. They reached a deal on the deportation plan. *Id.* at 596.

Mr. Gessen said "if there was a cheaper way to get rid of her that would be good too." 4-ER-614. He said that $100,000 was "simply more expensive." *Id.* Rizzo said there was a "cheaper way and probably a more permanent way to do it." *Id.* at 615.

At this point, Rizzo believed they were discussing a murder-for-hire plan. 4-ER-617. Mr. Gessen believed they were discussing a deportation/removal plan. At no time did Mr. Gessen or Rizzo ever use the words murder, kill or murder-for-hire. 5-ER-746-747.

Rizzo estimated that the new plan would be half-the-cost of the deportation plan. 4-ER-620. Mr. Gessen said this price would be "much easier." *Id.* Rizzo asked for Chigariro's location. Mr. Gessen agreed to "do the full recon." *Id.* at 621. Mr. Gessen said, "we just shifted gears." *Id.* at 622. They agreed to

11

communicate via Signal and avoid the "words" they mentioned in their meeting. *Id.* at 623.

On June 22, 2022, Rizzo and Mr. Gessen met a second time. 4-ER-672. They met in New York City. *Id.* Mr. Gessen agreed to pay Rizzo 50% of the cost upfront and 50% after completion. *Id.* at 676. Mr. Gessen gave Rizzo a gold coin worth some $2,000 as part of the upfront payment. *Id.* at 686.

Mr. Gessen mentioned that Chigariro had just "won the green card lottery," to which Rizzo responded: "She did? Well, I'm glad we didn't go that route then." 4-ER-678. Rizzo thought he conveyed he was glad that they did not undertake the deportation plan or the removal plan. *Id.* Mr. Gessen thought Rizzo meant he was glad they did not undertake the deportation plan. At no time during the June 22, 2022 meeting, were the words murder, kill or murder-for-hire mentioned. 5-ER-745-746.

On June 24, 2022, Mr. Gessen sent a consultancy agreement to Rizzo. 4-ER-700-701. Rizzo believed that Mr. Gessen was covering "his tracks for the payment for the murder for hire." *Id.* at 703. Mr. Gessen sent Chigariro's identifying information, to Rizzo. *Id.* at 707-716.

On June 29 and July 8, 2022, Mr. Gessen paid the rest of the upfront payment. 5-ER-898.

Later, Mr. Gessen and Rizzo confirmed that they were "moving along on schedule with both projects." (Ukraine and Chigariro) 4-ER-725-726. Rizzo informed Mr. Gessen that the Chigariro plan would be completed on July 28, 2022, and instructed him to put charges on his credit card to build an alibi. *Id.* at 732-733. Rizzo asked Mr. Gessen whether he would have an issue with "showing [additional guests] the exit." Mr. Gessen responded that he was "ambivalent." *Id.* at 733-734.

**Priscilla Chigariro**

Priscilla Chigariro is Mr. Gessen's former partner. 5-ER-823. They met in Zimbabwe in 2011. *Id.* In 2013, they had a son, O.G. *Id.* at 825. They separated in March 2014 and reconciled a short-time later. However, they were no longer living together. *Id.* Mr. Gessen moved to Harare and then Russia. *Id.* at 825-826. In 2016, Chigariro moved to Russia. *Id.* at 826. She and Mr. Gessen reconciled but separated again in August 2018. *Id.* at 825-826. Their daughter E. G., was born that November. *Id.*

In June 2019, Chigariro traveled to Zimbabwe. 5-ER-830. When she returned, she discovered that Mr. Gessen had taken their son to the United States to see medical doctors. *Id.* at 831. Mr. Gessen "didn't say whether or not he was returning." *Id.* at 834. Chigariro was unable to obtain a visa to travel to the

13

United States. *Id.* at. Chigariro was unable to get Russian authorities to intervene. *Id.* at 837. Chigariro filed "a Hague petition." *Id.* She obtained a birth certificate for E.G. *Id.* at 840-841. Chigariro and E.G. then traveled to Zimbabwe. *Id.* at 842.

Chigariro filed for custody of O.G. in Zimbabwe, while Mr. Gessen filed the same in Massachusetts. 5-ER-844.

In July 2021, Chigariro obtained a visa to attend court in Massachusetts. 5-ER-845. Both parents were granted partial custody of O.G. 5-ER-850-851.

In December 2021, Chigariro was to receive E.G. for a visit. 5-ER-851. However, she was unable to reach Mr. Gessen. After contacting the police and her attorneys, she obtained a court order for temporary custody. *Id.* at 853. She sent the order to Mr. Gessen via cellphone. *Id.* at 855. She learned that Mr. Gessen and their son were in Canada. *Id.* at 858.

On January 5, 2022, Mr. Gessen was detained by Canadian authorities. 5-ER-859. He was later extradited to Massachusetts. *Id.* Chigariro received custody of the children. Mr. Gessen paid child support. *Id.* at 861.

**Jeffrey Young**

Concord Massachusetts Detective Jeffrey Young investigated Mr. Gessen taking his son in December 2021. He spoke with Mr. Gessen on December 28. 5-

ER-871.  Mr. Gessen advised him that he was out of the country with his son.  *Id.* at 874.

Mr. Gessen acknowledged he was aware of the court order requiring him to return his son to Massachusetts.  5-ER-874.  He said he was discussing the order with his attorneys.  *Id.*

Young determined that Mr. Gessen was in Montreal, Canada.  5-ER-876. He learned that Mr. Gessen had airline tickets for travel to London.  *Id.*

The Concord police obtained an arrest warrant for Mr. Gessen for parental kidnapping.  5-ER-876.

**Other Witnesses**

FBI agent Benjamin Fierberg arrested Mr. Gessen on July 28, 2022 in Massachusetts on the murder-for-hire charge.  5-ER-884-885.  FBI agent David Peacock identified the June 29, 2022 payment of $18,000 and the July 8, 2022 payment of $5,000 both made by Mr. Gessen to an FBI account.  5-ER-898.  FBI Agent Christopher Bognanno determined that Ms. Chigariro had no criminal history in the United States.  7-ER-1256-1257.  He did not check outside the United States.  *Id*.

The parties stipulated that the Signal application, Mr. Gessen's cell phone, his various trips and the two wire transmissions of money involved interstate

commerce.  5-ER-953-954.

### Allen Gessen

#### Family Background

Allen Gessen met Chigariro in November 2011 in Zimbabwe.  6-ER-969. Their relationship lasted until the end of 2018 "with some interruptions."  *Id.* They were not married.  *Id.*

In 2014, Mr. Gessen relocated to Russia.  6-ER-970.  Chigariro and their son, O.G. moved there in 2016.  *Id.*

Around September 2018, Chigariro told Mr. Gessen that "she met somebody else, and that [their] relationship was no longer viable."  6-ER-971.  Their second child, E.G., was born a month later.  *Id.*  To accommodate their new child and the ending of the relationship, Mr. Gessen rented "a very large apartment in Moscow" so that they could live "separate but together."  *Id.*

In June 2019, it became clear that reconciliation with Chigariro was not possible.  6-ER-971.  Russia "had no jurisdiction over the kids" and Chigariro's inability to speak Russian meant "she could not sustain herself in Russia independently."  *Id.* at 972.  O.G. was traumatized by the separation and needed therapy.  *Id.* at 976.  Chigariro and Mr. Gessen "agreed that [they] would move to the United States."  *Id.* at 979.  Mr. Gessen began the process of moving.  *Id.* at

16

972. Mr. Gessen and O.G. are both United States citizens. *Id.* at 977.

Due to the complexity of their relationship, and because Chigariro wanted Mr. Gessen to pay her for spending time with their son, Mr. Gessen left for the United States with O.G., without telling Chigariro. 6-ER-980. He did not want to "buy [his] son," but also wished to "avoid a big confrontation." *Id.*

Mr. Gessen did not intend on keeping Chigariro and O.G. apart. *Id.* at 983. He expected to be reunited with Chigariro in the United States "within six to eight weeks." *Id.* at 981. However, this became impossible because E.G. did not have the necessary documents. *Id.* Mr. Gessen provided for Chigariro until October, when she registered E.G. as her daughter to the exclusion of Mr. Gessen. *Id.* at 982.

In November 2019, Chigariro traveled to Zimbabwe to complete the visa process for traveling to the United States. 6-ER-983. Mr. Gessen "agreed to cover all of [her] expenses in the United States for the first couple of years." *Id.* at 984. That same month, Mr. Gessen filed for custody of O.G. in Massachusetts to "be able to make medical and educational decisions." *Id.* at 985.

In March 2020, Mr. Gessen filed a Hague petition requesting that E.G. "be sent to the United States, according to [their] agreement." 6-ER-985. In June,

17

Chigariro filed a Hague petition to move O.G. to Zimbabwe.[1]  *Id.*  Mr. Gessen then filed for paternity of E.G. and Chigariro filed for custody of O.G. both in Zimbabwe.  *Id.*  Eventually, the Massachusetts court denied Chigariro's application, and the Zimbabwean court denied Mr. Gessen's application.  *Id.* at 986.

In December 2021, Mr. Gessen dismissed his Massachusetts application and traveled to New York with O.G.  6-ER-990.  They planned to "take a one-week holiday in Canada," and then travel to Zimbabwe via London.  *Id.*  He expected Chigariro to return to Zimbabwe as well.  *Id.* at 991-992.  He communicated his travel plans to Chigariro.  She did not agree with them.  *Id.* at 992.

Mr. Gessen and his son traveled to Canada.  6-ER-994.  Mr. Gessen received a court order prohibiting him from removing O.G. from Massachusetts and ordering his return.  *Id.* at 993.  Mr. Gessen was surprised by the order and consulted his lawyers.  *Id.* at 994.  He was "assured" that "it will have no weight in the Zimbabwean court."  *Id.*  His Massachusetts lawyers concluded that the order was probably not binding, but it would be safer to comply.  *Id.*

---

[1]  In December 2021, the court deciding the Hague petition ruled that Zimbabwe was not O.G.'s habitual home, and he could not be ordered back to Russia because the United States and Russia had not entered into a Hague treaty. 5-ER-847-848.

Mr. Gessen was arrested at the Montreal airport for violating the order and detained at an immigration detention facility. 6-ER-995-996. He was later deported to New York and arrested for being a "fugitive from justice." *Id.* at 996. He was extradited to Massachusetts on a parental kidnapping charge. *Id.*

**Mr. Gessen and Rizzo**

In February 2022, Mr. Gessen wanted to invest in a factory in Estonia to produce vests and helmets. 6-ER-1010. To obtain funding, Mr. Gessen contacted Kiselev, who he believed was a lobbyist "that represented Ukrainian interests in Washington, D.C." *Id.* at 1011-1012.

Later, Mr. Gessen asked Kiselev for assistance in having Chigariro deported. 6-ER-1014.

In March 2022, Mr. Gessen filed a whistleblower complaint against Chigariro with the INS, seeking to have her deported. 6-ER-1003. He called a friend at the INS to ensure that his complaint would be "acted on and properly investigated." *Id.* at 1004.

In April 2022, Mr. Gessen and Chigariro agreed to equal custody of both children and to recognize Mr. Gessen's paternity of E.G. 6-ER-1002. Mr. Gessen agreed to provide Chigariro "with sufficient means to support herself comfortably in the United States until she receive[d] permanent immigration status." *Id.*

19

In May 2022, Kiselev arranged a meeting between Mr. Gessen and Rizzo regarding the Estonian factory. 6-ER-1020. Kiselev told Mr. Gessen that Rizzo was "from one of those three-letter organizations." *Id.* Mr. Gessen believed Rizzo was a corrupt official with connections to law enforcement. *Id.* at 1022-1023.

On June 2, 2022, Mr. Gessen met with Rizzo in Florida. Kiselev did not attend. 6-ER-1021. Mr. Gessen understood that "there was significant preliminary interest [in the factory], and that [his] job was to basically explain whatever questions there may be, go through the financial model, answer the remaining questions, and try to close the deal." *Id.* at 1027. However, "[v]ery quickly, the conversation touched upon relationships." *Id.*

Rizzo asked Mr. Gessen: "If it's a blank slate, what exactly do you want?" 6-ER-1034. Mr. Gessen responded that he wished for Chigariro to return to Zimbabwe while the children remained in the United States. *Id.* Rizzo quoted Mr. Gessen $100,000 for the deportation. *Id.*

Although Mr. Gessen did not have $100,000, he nevertheless agreed to pay for Chigariro's deportation. 6-ER-1036. He knew the plan was illegal. *Id.* at 1037.

Mr. Gessen asked Rizzo about a less expensive method. 6-ER-1038. Rizzo said there was a cheaper plan that would be "more permanent." *Id.* at 1042. Mr.

Gessen interpreted "more permanent" to mean Chigariro's removal from the United States. *Id.* He agreed to provide Rizzo with information about Chigariro to facilitate her removal. *Id.* at 1054.

After the meeting, Mr. Gessen sent a letter of engagement to Rizzo as a "sneaky way of getting [his] last name without asking him directly." 6-ER-1028. They agreed to use Signal. *Id.* at 1058.

Mr. Gessen met with Rizzo on June 22 in New York to discuss the factory investment and Chigariro's removal. 6-ER-1085. Rizzo quoted $50,000 for what Mr. Gessen thought was the removal of Chigariro. Rizzo asked for $25,000 upfront. *Id.* at 1089. Mr. Gessen gave a gold coin worth some $2,000 to Rizzo and sent a consultancy agreement for the transfer of the remaining funds. *Id.* at 1090-1092. He later transferred some $23,000 to an account provided by Rizzo. *Id.* at 1091. He continued to communicate with Rizzo regarding the removal plan. *Id.* at 1104.

Mr. Gessen did not speak about or intend to have Chigariro killed. 6-ER-1104. He wanted her removed, not killed. He did not speak in code. *Id.* He did not believe that Rizzo was speaking in code. *Id.* at 1061.

On July 28, 2022, Mr. Gessen was arrested on the murder-for-hire charge. 3-ER-323.

## V.    SUMMARY OF ARGUMENT

The outcome of the trial hinged on whether the jury believed Mr. Gessen—that they were discussing the immigration removal of Chigariro or Agent Rizzo—that they were discussing her murder.  Mr. Gessen was entitled to a fair opportunity to present his defense.  But rather than receiving that opportunity, Mr. Gessen's trial was marred by error that prevented the jury from deciding the case based on who was telling the truth.  Instead, the jury was presented with evidence that skewed the verdict towards the prosecution—at the expense of the defense.  Had it been a true who do you believe test, the jury would not have been able to conclude that Mr. Gessen wanted to kill his former partner.

Importantly, the prosecution failed to prove all elements of the murder-for-hire offense.  Foremost, there was no "meeting of the minds" as to the murder-for-hire agreement.  Mr. Gessen agreed to have Chigariro deported, then removed, from the United States.  He did not agree to have her killed.  Rizzo, on the other hand, without the words murder, kill or murder-for-hire ever being used in the discussions, claimed that he understood that Mr. Gessen was hiring him to have someone kill Chigariro.  Without an explicit meeting of the minds, there was insufficient evidence to prove the charge.

Secondarily, the government did not prove the "consideration" and "pecuniary value" elements of the charge. A conviction for murder-for-hire requires an agreement between a solicitor and a hitman who receives something of pecuniary value. Here, there was only an intermediary, not a hitman.

In the same way, the trial court erred in denying the motions for acquittal and erred in not giving the defense theory jury instruction.

Along those lines, the court erred in allowing Rizzo to testify as to Mr. Gessen's thoughts and his understanding of Mr. Gessen's statements. The court also erred in not granting a new trial based on Rizzo's improper testimony.

In addition, the court erred in admitting evidence of Mr. Gessen taking his son to the United States in 2019, then to Canada in 2021 and admitting the parental kidnapping charge. The incidents were not sufficiently similar to the charged offense, did not go to intent or motive for killing Chigariro and were cumulative and more prejudicial than probative. Moreover, the court erred in finding that the Canada travel was inextricably intertwined with the charged offense as it was not needed to tell the story of the crime. And, while the travel was improperly admitted, the admission of the parental kidnapping charge was over-the-top.

23

Furthermore, the prosecutor, over repeated sustained objections, asked impermissible questions during witness examinations, including accusing trial counsel of helping Mr. Gessen with his testimony. This tactic unfairly undermined Mr. Gessen's credibility and violated due process.

Additionally, the government failed to prove that the Northern District was the proper venue, and the court erred in not finding so and in not giving the modified venue instruction.

Finally, the cumulative nature of the errors warrant reversal.

## VI. STANDARDS OF REVIEW

In sufficiency of evidence matters, the court reviews the evidence in the light most favorable to the government to determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Motions for acquittal are reviewed de novo. *United States v. Sarkisian*, 197 F.3d 966, 984 (9th Cir. 1999).

Motions in limine are reviewed for an abuse of discretion. *United States v. Alvirez*, 831 F.3d 1115, 1120 (9th Cir. 2016).

This admission of lay opinion testimony is reviewed for an abuse of discretion. *United States v. Rodriquez,* 971 F.3d 1005, 1016 (9th Cir. 2020).

24

The denial of a defendant's motion for a new trial is reviewed for an abuse of discretion. *United States v. King,* 660 F.3d 1071,1076 (9th Cir. 2011).

The admission of evidence and other act evidence is reviewed for an abuse of discretion. *United States v. Cox*, 963 F.3d 915, 924 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1281 (2021); *United States v. Carpenter*, 923 F.3d 1172, 1180-81 (9th Cir. 2019).

Whether specific evidence falls within the scope of Federal Rule of Evidence 404(b) is a question of law reviewed de novo. *United States v. Lague*, 971 F.3d 1032, 1037 (9th Cir. 2020). The same as to whether certain conduct constitutes "other crimes." *Carpenter,* 923 F.3d at 1180-81.

Whether jury instructions adequately cover a defendant's proffered defense or theory of the case is reviewed de novo. *United States v. Liew,* 856 F.3d 585, 596 (9th Cir. 2017). The denial of a defendant's jury instruction due to an inadequate factual basis is reviewed for an abuse of discretion. *United States v. Daane*, 475 F.3d 1114, 1119 (9th Cir. 2007). The denial of a jury instruction based on a question of law is reviewed de novo. *United States v. Castagana*, 604 F.3d 1160, 1163 n.2 (9th Cir. 2010).

Venue is a question of law reviewed de novo. *United States v. Lozoya*, 982 F.3d 648, 650 (9th Cir. 2020)

## VII. ARGUMENT

### A. The Government Did Not Introduce Sufficient Evidence to Prove Murder-for-Hire.

#### 1. Mr. Gessen Did Not Agree to Hire Someone to Kill.

Importantly, there was no "meeting of the minds" as to the murder-for-hire agreement. Mr. Gessen first agreed to have Chigariro deported, then later removed, from the United States. He did not agree to have her killed. Rizzo, on the other hand—without the words murder, kill or murder-for-hire ever being said by anyone—claimed that Mr. Gessen was hiring him to have someone kill Chigariro.

Without an explicit meeting of the minds as to what was agreed, there was insufficient evidence to prove the charge. *United States v. Phillips*, 929 F.3d 1120, 1124 (9th Cir. 2019) ("The words 'as consideration for' do not strictly import contract law, but instead require *a clear mutual agreement* between the solicitor and hitman of payment in exchange for murder. . ..") (emphasis added). The statute "proscribes a very limited category of behavior; only those instances in which one party agrees to commit a murder in exchange for another party's provision (or future promise) of payment are punishable under § 1958." *United States v. Frampton*, 382 F.3d 213, 217 (2d Cir. 2004).

26

The consideration requirement "is interpreted in 'the traditional sense of bargained for exchange,' *United States v. Wicklund*, 114 F.3d 151, 154 (10th Cir. 1997), so that there must be a 'quid-pro-quo (or at least the promise of such) between the parties to the transaction,' *United States v. Hernandez*, 141 F.3d 1042, 1057 (11th Cir. 1998).  *See also United States v. Richeson*, 338 F.3d 653, 657 (7th Cir.2003) ('[C]onsideration retains its contract law meaning of a bargained-for exchange of something of value.')" *United States v. Hardwick*, 523 F.3d 94, 99-100 (2nd Cir. 2008).

Importantly, it is the "defendant's intent that controls.  *Richeson*, 338 F.3d [at] 656 ('The federal murder-for-hire statute requires the government to prove that the accused intended for a murder to be committed' . . .).  The nature of the solicitor's intent is especially important when the would-be murderer is an undercover agent who by definition never intends to commit the crime.  *See generally United States v. Ritter*, 989 F.2d 318, 321 (9th Cir. 1993) (reversing convictions for conspiracy to commit murder-for-hire for two defendants: the first did not know anyone was paid to commit the murder; the second also lacked the required intent because the government agent pretending to be a hit man said he would not charge anything for the murder)." *Hardwick*, 523 F.3d at 100.

According to the statute, "only those instances in which one party agrees to commit a murder in exchange for another party's provision (or future promise) of payment are punishable under § 1958. *See United States v. Washington*, 318 F.3d 845, 854 (8th Cir.2003) ('The consideration requirement of [§ 1958] has been interpreted in the traditional sense of a bargained-for exchange.'). *Frampton*, 382 F.3d at 217-218. In the same way that a plea agreement is viewed, the court should evaluate the murder-for-hire agreement. "In construing an agreement, the court must determine what the defendant reasonably understood to be the terms of the agreement when he pleaded guilty. *Id.* (quoting *United States v. De la Fuente*, 8 F.3d 1333, 1337 (9th Cir. 1993))." *United States v. Atherton*, 106 F.4th 888, 903 (9th Cir. 2024). "Plea agreements are contractual in nature and are measured by contract law standards." *United States v. Keller*, 902 F.2d 1391, 1393 (9th Cir.1990).

What Mr. Gessen understood regarding the plan concocted by Rizzo and Mr. Gessen was key. Neither Mr. Gessen nor Rizzo ever said murder, kill or murder-for-hire. The evidence of murder was based on what Rizzo understood Mr. Gessen to have said or what he believed Mr. Gessen thought.

To prove murder-for-hire, the government had to prove that Mr. Gessen "used or caused another to use a facility in interstate or foreign commerce"; that he

28

"did so with the intent that murder be committed" and that he "intended that the murder be committed in exchange for pecuniary value, namely, $50,000." 7-ER-1277. The government proved the interstate element and partially proved the exchange for pecuniary value elements. But the government failed to prove that Mr. Gessen had "the intent that murder be committed," thus faltering as to the second and third elements. There was no proof of Mr. Gessen's intent to murder—other than Rizzo's testimony that Mr. Gessen wanted it and that he expressed so through an undefined and unidentified code.

The evidence was quite clear that Rizzo and Mr. Gessen never used the words murder, kill, or murder-for-hire, or any other like word. 7-ER-1285; 5-ER-788. Rizzo testified as follows:

A No, sir. I did not use terms like "kill" and "murder."

. . .

Q. You didn't use those words, correct?

A That's correct. We talked in code, sir.

. . .

Q Did [Mr. Gessen] ever use the word "murder"?

A He did not.

Q He never used the word "kill," correct?

29

A       He did not.

. . .

Q       In none of those oh recordings do you use the word "kill"?

A       No, sir.

Q       And in none of those recordings do you use the word "murder," right?

A       That's correct, sir.

. . .

Q.      You made a specific decision not to use those words, right?

A       That's correct.

. . .

Q       And those words could have been used, right?

A       Correct.

Q       And those words were not used.

A       No.

5-ER-745-748.

Mr. Gessen spoke in clear language about what he wanted. Rizzo did the same but claimed that the "clear words" he used were actually code for murder-for-hire. Rizzo claimed that the "clear" words Mr. Gessen spoke were code for

the same. Yet, Rizzo never defined or provided a ledger of the words that equated to murder, kill or murder-for-hire. He simply interpreted whatever Mr. Gessen said to convey that message.

More troubling was that the court allowed Rizzo to testify about what he understood Mr. Gessen meant when he spoke. 3-ER-406 and 4-ER-644. Although the court twice said that Rizzo "doesn't know what was in Mr. Gessen's head" (4-ER-589-590), he was nonetheless allowed to testify "to what he believed Mr. Gessen thought." 4-ER-599. See Argument VII.C.

While this improper testimony allowed the government to fill in some of the blanks, the government still failed to produce direct evidence of any agreement between Mr. Gessen and anyone else to commit murder. Instead, the government's case rested on inferences and assumptions of what Rizzo understood and conveyed about what Mr. Gessen was thinking. None of this evidence allowed a rational juror to fairly infer Mr. Gessen's intent. 2-ER-141.

No rational juror could have concluded that Mr. Gessen had a murderous intent when he used an interstate facility. He wanted to have Chigariro removed from the United States through a bribery deportation or removal scheme. The jury heard substantial evidence of Mr. Gessen's plan for deportation, but not a shred of direct evidence of any killing.

31

## 2. A Hitman Did Not Receive Pecuniary Value.

A conviction of a substantive offense under § 1958 requires an agreement between the solicitor and the hitman. *Phillips*, 929 F.3d at 1124 ("require a clear mutual agreement between the solicitor and hitman of payment in exchange for murder" . . . encompass[ing] a quid pro quo understanding . . ..."); *United States v. Chong*, 419 F.3d 1076, 1081 (9th Cir. 2005) ("Congress intended the statute to punish 'both the man who ordered the murder and the 'hit man.'").[2] *Hardwick*, 523 F.3d at 99-100 (citing *Frampton*, 382 F.3d at 217-219).

To sustain a conviction of a murder-for-hire "there must be evidence that the hitman clearly understood they would receive something of pecuniary value in exchange for performing the solicited murderous act." *Chong*, 419 F.3d at 1082. 7-ER-1392, 1395. In short, "you get something and you give something." *United States v. Kincaid-Chauncey*, 556 F.3d 923, 938 (9th Cir. 2009). Yet, a *quid pro quo* understanding cannot exist between a real solicitor and a fictional solicitee.

Mr. Gessen only dealt with Rizzo, who was neither pretending to be a hitman nor a solicitee. There was no *quid pro quo* exchange. As a fictional

---

[2] Although *Chong* and *Philips* are murder-for-hire conspiracy cases, the principle of having an agreement between the solicitor and the hitman or an intermediary for the hitman is the same. You can't hire someone to kill someone and you can't be hired to kill someone unless you agree to do so. See Argument A.1.

intermediary, Rizzo did not have or pretend to have an understanding that he was expected to commit murder or to receive anything of pecuniary value. Rizzo was facilitating the scheme as an unspecified "favor" not in consideration of anything and not for anything of pecuniary value. 4-ER-585.

Rizzo only promised to pay a nonexistent hitman with Mr. Gessen's funds to commit murder. However, a nonexistent hitman can neither understand that they are "expect[ed]" to commit the murder or understand that they are to receive a payment in exchange for that murder. A hitman—who does not exist—cannot contemplate consideration or have a "*quid pro quo* understanding." He cannot understand that he is to "get something" (of pecuniary value) and to "give something" (performance of the murder). *Kincaid-Chauncey*, 556 F.3d at 938.

In sum, because no real person understood or pretended to understand that they were to commit the murder or to receive anything of pecuniary value, the government failed to prove the existence of a *quid pro quo* understanding and thus failed to prove the "consideration" and "pecuniary value" elements.

## B. The Trial Court Erred in Denying the Motions for Acquittal.

### 1. Background

The court must "determine whether the evidence at trial, including any evidence of innocence, could allow any rational trier of fact to find the essential

33

elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.

"[T]he evidence so construed may still be so supportive of innocence that no rational juror could conclude that the government proved its case beyond a reasonable doubt." *United States v. Nevils,* 598 F.3d 1158, 1165 (2010). Insufficient evidence exists when the verdict is supported by mere speculation or where the government fails to prove an element. *Id.* at 1167.

Following the prosecution case, counsel made a motion for acquittal. 6-ER-966. Counsel argued that the government failed to introduce sufficient evidence to sustain a conviction because of the speculative nature of the evidence and the inability to prove pecuniary gain and bargaining for agreement with a hitman. 2-ER-133. Specifically, counsel argued "that as to intent, there hasn't been sufficient evidence put forth, and the evidence that has been put forth is circumstantial." 6-ER-966. The court denied the motion. 6-ER-967.

The evidence demonstrated that Mr. Gessen did not possess the requisite intent to murder Chigariro. Rizzo acknowledged that when he initially spoke with Kiselev regarding Mr. Gessen, their conversation was about bribing a fictitious individual to engage in the deportation of Chigariro. 4-ER-571-573. Rizzo testified that when he first met Mr. Gessen, their conversations were about a bribe he was soliciting to initiate a fictious deportation investigation into Chigariro. *Id.*

34

at 585, 595.

Rizzo testified to what he believed Mr. Gessen was thinking based on statements of both Rizzo and Mr. Gessen that were played to the jury. 4-ER-585, 589, 599, 616. The statements were admitted over objection as being speculative. *Id.* at 586, 589-590, 599. Rizzo conceded that only his beliefs about what Mr. Gessen understood him to be saying and what Mr. Gessen meant in his statements supported his interpretation of whether Mr. Gessen intended to solicit a murder-for-hire. 5-ER-748-749, 787; 2-ER-141.

Mr. Gessen then filed a pro se motion for acquittal for insufficiency of the evidence on essentially the same grounds as raised by counsel. 2-ER-101. Primarily, Mr. Gessen argued that the government failed to prove that he "reached an agreement with a person who clearly understood that they themself would commit a murder in exchange for defendant's promise to pay or payment of something of pecuniary value—that is, a quid pro quo agreement." 2-ER-129.

The court denied the motion. 2-ER-15. The court erred.

### 2. There Was Insufficient Evidence Presented that Mr. Gessen Agreed to Commit a Murder-for-Hire.

Mr. Gessen and Chigariro had reached the end of their relationship and were engaged in a litigious battle over custody. Both parties agreed that Mr. Gessen

met with Rizzo and solicited him to take some action against Chigariro. But what they agreed to do was quite different.

The government's theory was that Mr. Gessen wanted to "get[] rid of his ex-wife so that he can have sole custody of his children." 7-ER-1281. According to the government, Mr. Gessen accepted Rizzo's offer to arrange for the murder of Chigariro, and that Mr. Gessen's intent could be gleaned from coded conversations with Rizzo. *Id.* at 1286; 2-ER-138-139.

Mr. Gessen maintained that his intention was to have Rizzo arrange Chigariro's unlawful deportation/removal, not killing. Rizzo corroborated that Kisielev had reached out to Rizzo regarding a bribery scheme of an immigration agent. 4-ER-571-573. Rizzo then suggested a "more permanent" method of removal in response to Mr. Gessen's request for a less expensive option. *Id.* at 614-615.

Rizzo testified that there was no overt discussion, agreement, or plan to murder Chigariro. 5-ER-745-748. Rather, Rizzo's testimony of Mr. Gessen's intent was derived from what he interpreted Mr. Gessen to mean during their conversations, rather than any statements actually made by Mr. Gessen. 4-ER-589, 627. As such, the government failed to meet its burden.

36

At the hearing on Mr. Gessen's pro se motion, the court noted that "there was an objection at the trial -- as to Mr. Rizzo's testimony about what he understood your conversation to mean, what he understood you to say." 7-ER-1408. The court said: "The Government points out that *United States versus Simas*[, 937 F.2d. 459 (9th Cir. 1991)] appears to sort of directly address that situation." *Id.* Mr. Gessen replied "that the *Simas*-specific language is that he was interpreting 'vague and seemingly incomprehensible statements.'" *Id.* He said that the "conversations I had with Rizzo were not incomprehensible, and that's why *Simas* wouldn't apply." *Id.* at 1408-1409. He noted that, in contrast, he and Rizzo "spoke openly" . . . [Rizzo's] statements [ ] were in ordinary English language and easy to understand." *Id.*

The court commented: "I mean, he's just talking about what's his -- his own testimony. 'This is why I said it. This is what I hoped.' And he's on the stand, you can cross-examine him. I mean, it's not hearsay. It's his own personal knowledge. It's what he's thinking." 7-ER-1411. Mr. Gessen responded:

> Well, Your Honor, I think that the question -- the question -- the relevant question is my state of mind. And my state of mind was based on things I heard and things I said.
>
> Things that Agent Rizzo had hoped I would conclude from his statements do not go to my state of mind at all because they are about his state of mind. But his state of mind is not in dispute. He said --

37

and he said it many times, "I wanted him to understand. I hoped Mr. Gessen would understand. I expected him to understand."

These are his raw ambitions, but they do not go to the question of my state of mind.

*Id.* at 1411-1412.

Finally, the court commented: "I don't think that Mr. Rizzo ever testified that you understood something; right? He didn't testify as to what was in your head. He was testifying as to what he understood, like the conversation happened, why he said what he said, and what he understood was happening." 7-ER-1409-1414. The court was wrong. Rizzo did testify to what Mr. Gessen thought. 4-ER-599; 2-RT-200.

### 3. There Was No Agreement Between a Solicitor and a Hitman Who Received Pecuniary Value.

In denying Mr. Gessen's pro se motion, the court reasoned that "[t]he plain language of the statute only requires the defendant intended the murder be committed in exchange for something of pecuniary value." 2-ER-18 (citing 18 U.S.C. § 1958(a)). But an agreement is required. Indeed, the court earlier noted: "[W]hat [18 U.S.C. § 1958] says is an agreement . . . to arrange the murder in return for something of monetary value."). 7-ER-1395.

In sum, because no one understood or pretended to understand that they were to actually commit the murder or to receive anything of pecuniary value for doing so, the government failed to prove the existence of a *quid pro quo* understanding and thus failed to prove the "consideration" and "pecuniary value" elements. As a result, Mr. Gessen's murder-for-hire conviction cannot be sustained due to insufficient evidence.

**C. The Trial Court Erred in Allowing Agent Rizzo to Testify as to His Understanding of Mr. Gessen's Statements and to his Thoughts.**

The prosecutors phrased their questions as asking for, and causing Rizzo to testify to, Mr. Gessen's thoughts or his understanding. 4-ER-586, 589-590, 597, 599, 600-601, 605-606, 608, 615, 618-619, 656, 670-671, 694; 5-ER- 813, 855-856, 903, 943, 945. The defense objected to the volume of speculative testimony by Rizzo. Counsel objected to "the line of questioning of the agent specifically as to his thoughts of Mr. Gessen." 4-ER-670-671. The court found counsel's objections "appropriate" but overruled them because it had already "clarif[ied] to the jury that [Rizzo is] testifying as to his understanding," rather than as to Mr. Gessen's thoughts. *Id.* at 671.

Not so. As the court had told the jury, Rizzo is testifying "to what he believed Mr. Gessen thought." 4-ER-599.

As noted, the outcome of the trial hinged on whether the jury believed Rizzo or Mr. Gessen. However, instead of permissibly challenging Mr. Gessen's credibility through impeachment, the prosecutors asked Rizzo what he understood Mr. Gessen to be thinking. In doing so, Mr. Gessen's credibility was undermined before he could testify. Rizzo had, based on nothing more than raw speculation, already told the jury that Mr. Gessen wanted to kill his partner. And Rizzo did so without the words, kill, murder or murder-for-hire ever being mentioned.

Rizzo claimed that he spoke in code, but he did not testify that Mr. Gessen knew he was speaking in code or provide any direct evidence that Mr. Gessen spoke in code. It was truly a one-way street.

> Q    Why did you not say "murder," "kill," "homicide" to Mr. Gessen on June 2nd and June 22nd?
>
> A    Okay. As I had mentioned earlier, Mr. Gessen had a high level of operational security. Using words -- and plus he's a lawyer. Using words like "murder," "kill" are indicative of cop-speak, or they're indicative of being scrutinized by law enforcement. **So, as an individual who is a member of organized crime, I recognize that and I speak in code.**

5-ER-802-803 (emphasis added).

While the court cautioned the jury several times about Rizzo's testimony being limited to his "understanding", the limitation was flawed and mixed. In order to explain one's understanding of what someone else was doing, you have to

40

consider his thoughts. Otherwise, the understanding is meaningless.

Some examples of Rizzo's "understanding" testimony follow:

So, what did you understand Mr. Gessen to be saying?

THE WITNESS: I understood Mr. Gessen saying that he was concerned with the letter being sent out and that his wife, if she received the letter, she may take the kids and leave.

4-ER-596-597.

. . .

A      I believe he was talking --

MR. RAJU: Objection.

THE COURT: Overruled.

4-ER-606.

. . .

Q      What was your understanding of a cheaper way to get rid of her?

A      Mr. Gessen was asking if there is a way to have her killed.

4-ER-615.

. . .

Q      What was your understanding of that clip?

A      Okay, it's very pivotal when I explain to him that there -- there -- well, Mr. Gessen said "Is there a cheaper way to get rid of

41

her?"

And I said "Well..."

He interrupted me and said: Well, that's simply quite expensive, or too expensive, something to that end.

That is absolutely very, very important. Because --

MR. RAJU: Objection.

THE COURT: Sustained. This is just arguing. He can say what he understood.

BY MS. HOSSEINI

Q    What did you understand from that conversation?

A    Mr. Gessen said that it was simply too expensive. And as we see later on in the conversation -- and this is pivotal –

MR. RAJU: Objection.

THE COURT: Sustained.

BY MS. HOSSEINI

Q    Agent Rizzo, we'll take out the "pivotal."

A    Okay.

Q    Please continue.

A    Because Mr. Gessen had already done research and already received the price from another organized crime syndicate --

MR. RAJU: Objection.

THE WITNESS: -- to have his wife killed.

THE COURT: Sustained, sustained. This is argument.

4-ER-615-617.

. . .

Q And when you heard Mr. Gessen say "And more definite," what was your understanding of that?

MR. RAJU: Objection.

THE COURT: Overruled.

BY MS. HOSSEINI

Q Please answer.

A "More definite" is permanent, dead.

4-ER-618.

. . .

Q Okay. And then you heard: "Okay, much easier, much easier... very happy to go that route," from Mr. Gessen. What was your understanding of "that route"?

A The route was the murder-for-hire contract.

4-ER-620.

. . .

Q What was your understanding of "I will do the full recon for you"?

43

A    Mr. Gessen told me that he's doing the full recon, or reconnaissance, meaning that he will provide me with all the information that I need to carry out the murder of his ex-wife.

4-ER-621.

Q    You have a deal. Okay. And then Mr. Gessen said "We just shifted gears."

You said "You're not kidding."

Shifted gears from what to what?

A    From deportation to, now, murder for hire.

4-ER-622.

. . .

Q    Agent Rizzo, you said, "She'll be taken out without them present." What did you mean by "taken out"?

A    Right. The prior sentence from Mr. Gessen, "As long as they're not witnesses."

So I responded by saying "No, they won't be; she'll be taken out without them present." Killed. Murdered.[3]

4-ER-633-634.

. . .

Q    We heard "Let's plan it for the end of July when you have the kids." What was that in reference to?

---

[3] Killed and murdered were added by Rizzo during his testimony. They were not part of the quote.

44

A    To murdering his ex-wife.

4-ER-635.

. . .

What did you mean by that?

A    It would be a significant cost savings from the $100,000 for the deportation scheme. It would be much less.

Q    Murder for hire would be cheaper than deportation?

A    That's correct.

4-ER-650.

. . .

Q    What did you mean when you said "Do you have any preference in the means? Or do you just want her gone?"

A    I asked Mr. Gessen if he had a preference on how he wanted her killed.

4-ER-687.

. . .

Q    What was your understanding of that message?

A    Mr. Gessen did not care either way on how it was carried out. He just wanted the objective to be achieved and he -- he didn't care about if we killed the boyfriend, if he was there.

4-ER-733-734.

45

. . .

A     Mr. Gessen said:

"So, I mean, incidently, if there was a cheaper way to get rid of her that would be good too."

Q     And since you two are speaking, when he said "get rid of her," what was your understanding of that?

A     To kill her.

. . .

Q     And: Another way to get rid of her would be good, too, led you to believe that you were talking about what?

A     Killing her.

5-ER-810-811.

Midway through Rizzo's testimony, counsel provided a fuller explanation for the objections.

> MS. MITCHELL: And just, Your Honor, we would like to object to the line of questioning of the agent specifically as to his thoughts of Mr. Gessen throughout the entirety of any time he was asked a question about: What was your interpretation, or what was your belief about what Mr. Gessen thought or was saying here, as to relevance. Specifically because if he is not an expert or someone else who is offering up some sort of opinion for that reason or formulating a reason for that opinion, it's not relevant to what he believed Mr. Gessen was thinking, unless he took some specific act or did some sort of action based off of that.
>
> And here, the agent is instead essentially just interpreting what he --

46

what Mr. Gessen's statements are, what he believes Mr. Gessen's statements to be.

And we would have a continuing objection to the line of questioning resulting --

THE COURT: Okay, all right; I'm going to overrule that. He's the other party to the conversation. So he said what he said, based on his interpretation of what was being said but the objection is noted. And I do think those objections Mr. Raju made were appropriate for me to clarify to the jury that he's testifying as to his understanding, although I think it's obvious he doesn't know, but I think those were appropriate. And I clarified as well.

4-ER-670-671.

Rizzo's testimony was riddled with speculation and improper opinion regarding what Mr. Gessen thought and about what he agreed to do. The key missing words—murder, kill, murder-for-hire—were added by Rizzo's "understanding" and his read of Mr. Gessen's thoughts, not fact. Without those added words, there was no agreement and there was no murder-for-hire.

A significant problem with Rizzo testimony involved the dichotomy between lay opinion and expert opinion testimony. Rizzo was not qualified as an expert. 2-ER-94. He testified as a lay witness. *Id.* Yet, his testimony mixed the two opinions. The mixture was deadly.

Expert witnesses are entitled to render opinions that involve hearsay and that require specialized knowledge. While "[l]ay opinion testimony is admissible

47

only to help the jury or the court to understand the facts about which the witness is testifying and not to provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or events." *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001).

Agents can be "qualified as experts to interpret intercepted conversations using slang, street language, and the jargon of the illegal drug trade. *See, e.g., United States v. Delpit*, 94 F.3d 1134, 1144 (8th Cir.1996); *United States v. Plunk*, 153 F.3d 1011, 1017 (9th Cir.1998); *United States v. Earls*, 42 F.3d 1321, 1324–25 (10th Cir.1994) (expert testimony was proper to show that defendants were speaking in code). What is essentially expert testimony, however, may not be admitted under the guise of lay opinions. . . . Such a substitution subverts . . . the reliability requirements for expert testimony . . .." *Peoples*, 250 F.3d at 641 (cleaned up).

The courts have held that "[w]hile the deciphering of coded language is helpful to the jury and therefore permissible, interpretations of "conversations as a whole" . . . are not appropriate." *United States v. Hawkins*, 934 F.3d 1251, 1264-1265 (11th Cir. 2019). Nor is it appropriate for the agent "to speculate about what was transpiring in phone calls and messages or to 'interpret' uncoded, ordinary language. *See, e.g., United States v. Torralba-Mendia*, 784 F.3d 652, 660 (9th Cir.

48

2015); *United States v. Vera*, 770 F.3d 1232, 1242 (9th Cir. 2014) ("[A]n officer may not testify based on speculation ... or interpret unambiguous, clear statements."); *United States v. Haines*, 803 F.3d 713, 734 (5th Cir. 2015) (finding testimony was admitted in error where agent 'offere[ed] his own interpretation of language that was well within the province of the jury to interpret' and 'ventured into speculation, usurping the jury's function, which is to draw its own inferences from the evidence presented'); *United States v. York*, 572 F.3d 415, 423 (7th Cir. 2009) ('Interpretations' of unambiguous words or phrases that are plainly within the jury's understanding ... would not assist the trier of fact to understand the evidence or to determine a fact in issue .... Instead, they would merely put an expert gloss on a conclusion the jury should draw." *Hawkins*, 934 F.3d at 1264-1265.

Here, Rizzo "effectively spoon-fed his interpretations of the [recorded statements] and the government's theory of the case to the jury, interpreting even ordinary English language," *United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013)—all of which presents a problem." *Hawkins*, 934 F.3d at 1265. As a result, Rizzo's "testimony as to his interpretations of the [statements] went beyond permissible lay opinion testimony under Rule 701(b) because, rather than being helpful to the jury, it usurped the jury's function" and given his "aura of expertise

49

and authority," there was an "increased [ ] risk that the jury would be swayed by his testimony, rather than rely on its own interpretation of the calls." *United States v. Grinage*, 390 F.3d 746, 751 (2nd Cir. 2004).

And by not qualifying Rizzo as an expert, the government avoided explaining "'the method [the expert] used to arrive at his interpretations.' Although the government made an adequate showing of the witness's experience, the witness did not explain in detail the methods he used to arrive at his interpretations of words that he was not familiar with before the investigation." *United States v. Freeman*, 498 F.3d 893, 901 (9th Cir. 2007) (citing *United States v. Hermanek,* 289 F.3d. 1076, 1094-1095 (9th Cir. 2002). As in *Hermanek,* there was "simply too great an analytical gap between the data and the opinion proffered." *Freeman*, 498 F.3d at 901.

In the end, Rizzo improperly testified as an expert when it came to codes, and improperly testified as a lay witness when it came to "specialized explanation or interpretations" that the jury could not make. He crossed the line twice.

**D.     The Trial Court Erred in Denying A New Trial Based on the Improper Testimony of Agent Rizzo.**

In his pro se motion for new trial, Mr. Gessen renewed his challenges to key portions of Rizzo's testimony as having been improperly admitted. 2-ER-24-25.

50

Mr. Gessen argued that "Rizzo repeatedly offered expert testimony on the ultimate issue of fact, namely whether Gessen intended to kill Chigariro and entered into a murder-for-hire scheme." *Id.* at 26. He provided several examples. *Id.*

Mr. Gessen argued that "Rizzo was not qualified to testify as an expert. Yet his testimony informing the jury that Gessen had entered into a murder-for-hire scheme could be perceived by the jury as expert testimony based on his specialized knowledge and training as an FBI agent." 2-ER-26-27. He argued that "by offering expert testimony as to the ultimate question of fact, Rizzo's testimony ran afoul of Federal Rule of Evidence 704(b)." *Id.* at 27. He noted that the "ultimate-fact opinion testimony was especially problematic and prejudicial given the absence of any curative instructions." *Id.*

The court denied the motion for new trial. 2-ER-35. The court erred.

Rizzo's testimony involved subject matters that rested on both expert and lay opinions. *Freeman,* 498 F.3d at 904.

At times, the government treated Rizzo as an expert. "Question: And in light of your training and experience did it make sense?" 4-ER-592; "Question: Have you worked in an undercover capacity in any other murder-for-hire schemes? Answer: I have and based on my experience and speaking with other undercover agents . . . . " *Id.* at 627-628. At those times, Rizzo's opinions presumed a

specialized knowledge.

At the same time, Rizzo repeatedly speculated about Mr. Gessen's state of mind by interpreting ordinary English language. In doing so, he improperly opined that Mr. Gessen was guilty. For example, Rizzo testified that when Gessen asked whether there was a "more permanent way" or "cheaper way to get rid of her," Mr. Gessen actually "was asking if there is a way to have her killed." 4-ER-614-615. Rizzo told the jury that when Mr. Gessen said "more definite," he meant he wanted Chigariro "dead." *Id.* at 618. He told the jury that Mr. Gessen's agreement to "do full recon" meant provide "all the information that I need to carry out the murder of his ex-wife." *Id.* at 621. When Mr. Gessen said: "We just shifted gears," Rizzo told the jury that this meant Mr. Gessen had steered the conversation "[f]rom deportation to, now, murder for hire." *Id.* at 622.

The words "cheaper" "to get rid of" "more definite" "do full recon" and "shifted gears" are not the type of "coded, oblique language" that courts have allowed lay witnesses to interpret for the jury. *Peoples,* 250 F.3d at 640. Instead, they are common words for the jury to interpret. *Haines,* 803 F.3d at 734; *Freeman,* 730 F.3d at 598 ("agent testifying as a lay witness may not explain to the jury what inferences to draw from recorded conversations involving ordinary language", as "[a]t that point, his testimony is no longer evidence but becomes

52

argument").

Rizzo, without foundation, repeatedly testified that he and Mr. Gessen spoke in code. 5-ER-785. Some examples follow:

Q:    In what way?

A    I talked in code on Signal because I did not want to use language that was more cop-like or, I would say, could be scrutinized by law enforcement. So I wanted to talk in code.

4-ER-623-624.

. . .

A:    That's correct. We talked in code, sir.

5-ER-745-745.

. . .

Q:    You wanted it to be clear?

A:    I wanted it to be clear. But we were talking in code, sir. And he understood what I said.

Q:    Right. That's exactly what I'm saying. You didn't use those words, correct?

A:    That's correct. We talked in code, sir.

5-ER-747.

Q:    Why were you speaking in code?

A:    Because that's what we do. As organized crime figures, you

53

> never openly talk. You always feel like you're being recorded. You always feel like you're being watched. So you use vernacular and terms that are familiar to individuals that don't necessarily spell out "kill" or "murder."

5-ER-785.

> . . .

> Q: Okay. And again, you used very vague language. Language that you called "code." Correct?

> A: Yes, sir.

5-ER-785.

> A. So, as an individual who is a member of organized crime, I recognize that and I speak in code.

5-ER-803

> . . .

> Q: What did that indicate to you as to how you should speak with Mr. Gessen in deciding to use words like "murder," "kill," "homicide"?

> A: Again, recognizing Mr. Gessen had a high level of operational security to avoid law enforcement scrutiny, I made the determination then that I would use code words.

5-ER-804.

But none of the words were code for murder-for-hire, kill or killing. None of the words used were defined by any independent source as being code for those

words.  They were not words that are commonly known or relied on as code, such as "brown" for heroin, "burrito" for pound, or "gat" for gun.  *Hermanek,* 289 F.3d. at 1090-1091; *Jurado v. Davis*, 12 F.4th 1084, 1094-1095 (9th Cir. 2021).  Importantly, the words were interchangeable— they applied to deportation or removal, just as much as murder-for-hire.

Labeling Rizzo's speculation as an understanding does not render it admissible.  Only where the "witness decoded specific phrases and explained the basis for his opinion as to their meaning, is lay opinion testimony [ ] proper." *Haines,* 803 F.3d at 729; *Freeman,* 730 F.3d at 597 ("A witness, lay or expert, may not form conclusions for a jury that they are competent to reach on their own.") The testimony should have been excluded. *Hawkins,* 934 F.3d at 1264 (improper for case agent to "'interpret' uncoded, ordinary language").

Rizzo's opinion that Mr. Gessen intended to engage in a murder-for-hire scheme, involved the ultimate fact, Mr. Gessen's mental state, and a legal conclusion.  *E.g.,* 4-ER-619 (Rizzo testified that he and Gessen had "entered into a murder-for-hire situation"); *Id.* at 620 (Rizzo told the jury that Gessen wanted to pursue a "route [that] was the murder-for-hire contract").  Yet, Mr. Gessen never used those words in the conversation.  Nor did Rizzo.  Rizzo's testimony regarding Mr. Gessen's guilt usurped the function of the jury to decide what to

55

infer from the content of the recorded conversations.

Rizzo's opinion that Mr. Gessen's conduct amounted to "murder-for-hire" required specialized knowledge and could not be admitted as lay opinion testimony. Rizzo used the term "murder-for-hire" many times to interpret such innocuous, ordinary phrases as "solution that works," 4-ER-631, or "another way." 5-ER-811. The phrase "well down the path" allowed Rizzo to repeat his opinion of Gessen's guilt of "murder-for-hire" several times. 5-ER-787.

Rizzo's lay opinion testimony improperly relied on hearsay and statements from unidentified sources. He testified that based on information he was told by others, a murder-for-hire contract could cost as little as $200 to as much as $100,000. 4-ER-628. While experts may rely on hearsay, lay witnesses may not do so. Fed. R. Evid. 703. *United States v. Lloyd,* 807 F .3d 1128, 115 5 (9th Cir. 2015) (Rule 701 prohibits testimony by lay witness based on "statements he heard from unidentified" others that was "beyond his own personal experience"); *Freeman,* 498 F.3d at 904 (agent offering lay testimony not "allowed to testify based on hearsay information [or] to couch his observations as generalized 'opinions' rather than a firsthand knowledge."

Rizzo's improper testimony drove the jury's verdict. With his "aura of expertise and authority," Rizzo told the jury that Gessen had engaged in a

murder-for-hire scheme. Rizzo's role in the investigation and the opinions he offered made his testimony 'the heart of the case against' Mr. Gessen. The recordings of Rizzo's two meetings with Mr. Gessen "required the drawing of inferences before they could be seen as inculpatory" as to the murder-for-hire charge, especially given the lack of any mention of the words murder, kill, death, etc. *Id.*

Rizzo's improper opinion testimony tainted the trial. The testimony was prejudicial in light of how frequently it was repeated and in the absence of any curative instructions. As such, the trial court should have granted Mr. Gessen's motions for new trial.

## E. The Trial Court Erred in Admitting Evidence of Mr. Gessen Taking His Son to the United States.

The prosecutor moved to introduce evidence of Mr. Gessen taking his son to the United States in 2019 and leaving Chigariro in Russia with their daughter. 2-ER-280-281. The government argued that "other acts are highly relevant to establish [Mr.] Gessen's state of mind, including motive, intent, knowledge, and plan. In the Russia-to-US kidnapping instance, [Mr.] Gessen exhibits a plan to remove P.C. from the son's life to attain sole custody." *Id.*

Mr. Gessen opposed the motion.  2-ER-211-216.  The defense conceded "that the ongoing contentious child custody hearings are inextricably intertwined with the events alleged in the indictment and does not contest admission." *Id.* at 212.  However, Mr. Gessen argued that this event was too remote, lacked sufficient support, was prejudicial, not material for non-propensity purposes and not "inextricably intertwined with the offense." *Id.*  He noted that "there is no elaborate scheme or conspiracy that needs to be given context.  This is a simple case where the government is alleging murder-for-hire occurred.  The jury will completely understand everything alleged by the government without this improper evidence." *Id.*  He also noted that it "was not part of a single criminal transaction and was not necessary in order to offer a comprehensible story." *Id.* at 213.

Mr. Gessen also argued that the 2019 travel had "limited relevance to Mr. Gessen's current state of mind." 2-ER-213.  By casting his travel with his son to a "tumultuous relationship and bitter custody dispute," the government ignored that he took his son to receive medical care. *Id.* at 213-214.  As to proving Mr. Gessen's alleged intent to murder, counsel offered a solution: "The testimony presented could easily be tailored to inform the jury of the custody dispute without the government delving into the inflammatory and highly prejudicial details about

Mr. Gessen's pending parental kidnapping charges, [and] travels with his son, . . .." *Id.* at 213-214.

Nevertheless, at the pretrial hearing, the court indicted that this act could come in "under sort of intent, motive, right, it goes to the intent to separate PC from the children." 3-ER-340-341. The court commented: "You're not conceding intent, so I think – I think it is relevant to the intent." *Id.* at 360. The court held: "That's what -- that's what is different, right. It's one thing to be in a custody dispute. It's another thing to act in a way that would actually take the mother of the children away from the children. And I think that's why it goes to intent, that it's different in kind." *Id.* Later, the court said that this evidence "goes to [Mr. Gessen's] intent" to "gain custody to the exclusion of the mother." 3-ER-360.

In its written ruling, the court allowed this evidence "to prove motive or intent with respect to Defendant and P.C.'s custody dispute." 2-ER-203. The court found it "relevant to [Mr. Gessen]'s alleged desire to get sole custody to the exclusion of [Chigariro]; that is, to separate his son from his mother." *Id.* at 204.

Whether Mr. Gessen wanted sole custody was immaterial to proving the murder-for-hire charge. The issue was whether Mr. Gessen wanted to have his wife deported/removed, or killed, not whether Mr. Gessen wanted sole custody. The case turned on whether the jury believed Rizzo or Mr. Gessen. Who to

59

believe should not have been proved through a 2019 trip to the United States.

Even if this evidence is relevant to prove motive or intent as to Mr. Gessen's custody desires, it was inadmissible to prove the elements of murder-for-hire. Under Rule 404(b)(2), the evidence was "too remote in time" and not sufficiently similar to the charged offense." *United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1264 (9th Cir. 2024).

First, the prior act occurred three years before the charged offense. 3-ER-359-360. Second, taking O.G. to the United States is not sufficiently similar to the charged offense of murder-for-hire. Such a showing "is necessary because if the other act is not sufficiently similar to the crime charged, 'it does not tell the jury anything about what the defendant intended . . . unless, of course, one argues (impermissibly) that the [other] act establishes that the defendant has criminal propensities.'" *United States v. Preston*, 873 F.3d 829, 840 (9th Cir. 2017). The court recognized: "Of course [the question of whether Mr. Gessen had the intent to murder Chigariro] i[s] different [from intent to separate Chigariro from the children], but it is related." *Id.* at 359. But being related is not the same as being sufficiently similar. And that showing is what is required.

Moreover, even if the evidence was admissible under 404(b), it was merely cumulative and more prejudicial than probative. The probative value of the

60

evidence was "substantially outweighed by a danger of" unfair prejudice, confusion and misdirection. Fed. R. Evid. 403.

At trial, Mr. Gessen intended to "concede that [he and Chigariro] were engaged in a custody battle where each parent was trying to gain custody of their children." 3-ER-360. The government had overwhelming evidence of that intent. Indeed, Mr. Gessen testified that he told Rizzo in their first conversation: "I said that I would like for Priscilla to go back to her country and for the children to remain in the United States." 6-ER-1034. This conversation was introduced in evidence. 4-ER-578. There is nothing more probative to proving intent than a defendant's own confession. *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991).

Further, it is undisputed that Mr. Gessen intended to have Chigariro removed from the country in a manner that would prevent her from returning; thus separating her from the children. *See, e.g.*, 6-ER-1048 (Mr. Gessen testifying to the "more permanent" solution of removing Chigariro, such that she "might not be allowed to reenter for ten years"). Naturally, Chigariro would be unable to exercise custody while out of the country. Thus, this intent is the same as the intent to "gain custody to the exclusion of the mother." *See* 3-ER-360.

Accordingly, evidence of Mr. Gessen's intent to gain sole custody was already proven beyond doubt. No more evidence was needed to prove that intent.

Thus, the trial court abused its discretion in admitting the evidence for that purpose.

Mr. Gessen acknowledges that the trial court instructed the jury on the use of other acts evidence. 7-ER-1276-1277. But that was not enough to overcome the harm. Long ago, the Supreme Court found that the improper admission of prior-acts evidence "is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 475 (1948). Here, the erroneously admitted evidence created a risk that the jury's verdict was based on improper inferences.

### F. The Trial Court Erred in Admitting Evidence of Mr. Gessen Taking His Son to Canada and the Resulting Kidnapping Charge.

The defense moved to exclude evidence of Mr. Gessen taking his son to Canada in 2021, remaining there despite a court order that he return and his arrest and parental kidnapping[4] charge in Massachusetts. 2-ER-254. Mr. Gessen argued

---

[4] On May 15, 2025, the Commonwealth of Massachusetts entered "a nolle prosequi in the interest of justice" in the parental kidnapping case. *Commonwealth v. Gessen*, Concord District Court Docket No. 214CR001448. https://www.masscourts.org/eservices/searchresults.page?x=0nBx*MqoiKribpTbZ XF0HhyHf9BKtkEERZa4EvunGEselNSdPRn-3yrLNWCIqh4JXNyktvq3pUG725 -uY8h0tw.

that "presenting evidence regarding this charge will place him in a tenuous position of having to comment on a criminal case that is pending in a different court." *Id.* He also argued that the pending state court charge is not relevant to the murder-for-hire charge and will generate unfair prejudice through propensity evidence. *Id.*

The government argued that the evidence "is inextricably intertwined as by Gessen's own admission, this evidence leads to and motivates him to have P.C. murdered. This context is imperative, as it directly shows why Gessen schemed to have P.C. murdered." 2-ER-246. Not so.

The court admitted the evidence "with respect to motive" and as "'inextricably intertwined' with the charged conduct and necessary 'to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime.'" 3-ER-340; 2-ER-204. The court found it to be "part of [Mr. Gessen's] motivation to have [Chigariro] deported or murdered." 2-ER-204.

Prior-acts evidence is not subject to 404(b) if it is "inextricably intertwined" with the charged offense. *United States v. DeGeorge*, 380 F.3d 1203, 1220 (9th Cir. 2004). Evidence is "inextricably intertwined" if it "constitutes a part of the transaction that serves as the basis for the criminal charge", or its admission is

63

"necessary to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Id.*

The Canada incident was not "part of the transaction that serves as the basis for the criminal charge" because it was not part of a "single criminal episode." *DeGeorge*, 380 F.3d at 1220. Indeed, the trial court held so. 2-ER-204. But, the court found the second prong satisfied because the evidence was necessary "to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Id.* The court erred. The Canada incident and resulting parental kidnapping charge was wholly irrelevant to the "time, place, and circumstances" of the murder-for-hire charge.

Moreover, although the trial court found the evidence relevant to prove motive as well, the proper avenue to consider its admission under that theory was not through "inextricable intertwining." Instead, it should have been analysed under 404(b). And under that test, it is inadmissible because its probative value is far outweighed by its prejudicial effect. This is true with respect to the trip itself, but particularly as to the parental kidnapping charge.

In the alternative, Mr. Gessen requested the admitted testimony be limited and the jury be given a limiting instruction. He also asked for the jury to be instructed to not speculate about the ongoing investigation into the kidnapping. 2-

ER-215-216.  The court gave a limiting instruction.  7-ER-1277.  But the court did not instruct the jury not to speculate about the ongoing investigation.  This left the jury to wonder about those charges, Mr. Gessen's guilt and its resolution.  And, as we now know, the ultimate resolution was the nolle prosequi of the charges.  See Fn 3.

> The speculation was fueled by the prosecutor's questioning of Rizzo.
>
> Q     Agent Rizzo, did you look into this child kidnapping case that Mr. Gessen was telling you about?
>
> A     I did not.
>
> Q     Was that part of what you were investigating?
>
> A     It's not part of my responsibility, ma'am.

4-ER-598.  The wholly unnecessary question only left room for the jury to further speculate about the charge and its outcome.

### G.    The Prosecutor Erred In Accusing Trial Counsel of Helping Mr. Gessen with His Testimony.

During the prosecutor's examination of witnesses, trial counsel made a number of specified objections, many of which were sustained: leading (4-ER-573, 633; 5-ER-939, 947-948); speculation (4-ER-589; 5-ER-855-856, 903, 943, 945); hearsay (5-ER-850); statement of law (5-ER-849-850); lack of foundation (5-ER-940, 943); argumentative (5-ER-544); non-question (7-ER-1220); and

asked and answered (7-ER-1221).  Trial counsel also made a number of

unspecified objections, many of which were sustained (or implicitly sustained):

speculation (4-ER-590, 597, 599, 608, 656, 694; 5-ER-813); not in evidence (4-

ER-612); and leading (4-ER-633; 5-ER-812).  On three occasions, the court

granted trial counsel's motions to strike improper questioning or testimony.  4-ER-

632; 5-ER-849-850.

Trial counsel further objected to the prosecutor's accusation that she had

helped Mr. Gessen with his testimony.  6-ER-1153.

> Q:     And you also said that you wanted to be reunited with your
>        children at any cost.
>
> A:     Oh, I testified that, right.
>
> Q:     Right. And then your lawyer helped you and said: Oh –
>
> MS. MITCHELL:   Objection.
>
> MS. HOSSEINI:   I'll rephrase.

6-ER-1153.

"A personal attack on defense counsel's integrity could constitute

misconduct."  *United States v. Santiago*, 46 F.3d 885, 892 (9th Cir. 1995).  The

prejudice can be "neutralized by the trial judge."  *United States v. Foster*, 711 F.2d

871, 883 (9th Cir. 1983). The same is true if "defense counsel agreed to the prosecutor's offer to correct any misconception." *Id.*

In this situation, the prosecutor rephrased its question before the court was able to rule on counsel's objection. 6-ER-1153. Thus, there was no "neutralization" of prejudice by the court, nor was there a corrective statement made to the jury by the prosecutor. *Id.* Rather, the jury was left with the impression that defense counsel had helped Mr. Gessen while on the stand.

The prosecutor's question was an "unfounded and inflammatory attack[] on the opposing advocate." *United States v. Young*, 470 U.S. 1, 8 (1985); *United States v. Tomsha-Miguel*, 766 F.3d 1041, 1047 (9th Cir. 2014) ("[A] prosecutor may not 'distort' the trial process by leading the jury to believe that defense counsel is dishonest."). The prosecutorial errors were "made even more indefensible by its repetition in the face of directions to desist." *United States v. Weatherspoon*, 410 F.3d 1142 (9th Cir. 2005). Reversal is warranted because it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 180 (1986).

**H.** **The Court Erred in Declining to Give a Theory of Defense Jury Instruction.**

Mr. Gessen proposed a jury instruction as to his theory of defense. 2-ER-190. The instruction modified Ninth Circuit Jury Instruction 16.7 by adding the following paragraph.

> In considering whether something of pecuniary value was promised or agreed to be paid as consideration for a murder, you are instructed that the defendant must have reached an agreement with a person who clearly understood that they themself would commit a murder in exchange for defendant's promise to pay or payment of something of pecuniary value—that is, a quid pro quo agreement.

*Id.* at 192.

The defense stated that that "the additional paragraph is an accurate statement of the law, according to *Chong* and a number of other cases." 2-ER-192; 6-ER-964. In short, Mr. Gessen requested that the jury be instructed that in order to find guilt, it must find that "the defendant must have reached an agreement with a person who clearly understood that they themself would commit a murder in exchange for defendant's promise to pay or payment of something of pecuniary value—that is, a *quid pro quo* agreement." 2-ER-192.

Defendants are entitled to a theory of the case instruction if it is supported by law and has *some* foundation in the evidence." *United States v. Winn*, 577 F.2d 86, 90 (9th Cir.1978) (emphasis added). The "failure to give such a requested

68

instruction is reversible error." *United States v. Noah*, 475 F.2d 688, 697 (9th Cir.), *cert. denied*, 414 U.S. 1095 (1973). *See United States v. Escobar de Bright*, 742 F.2d 1196, 1198 (1984).

The court declined to give the modification. 6-ER-964. The court commented: "It essentially saying that you can't have an undercover agent in a murder for hire. That's fine. I understand the argument. And it will preserved for appeal." *Id.* The court erred. As set out in Argument 2.B.3, the court should have instructed on the defense theory.

I. **The Government Failed to Prove Venue and the Court Erred in Not Giving the Defense Venue Instruction and Not Granting a New Trial.**

1. **The Trial Court Erred in Not Giving the Venue Instruction.**

Mr. Gessen sought a jury instruction on the question of venue and "a theory-of-the-defense instruction regarding the government's failure to prove venue was proper in the Northern District of California." 2-ER-181. He relied on *United States v. Cortes*, 757 F.3d 850, 857 (9th Cir. 2014) and *United States v. Burton*, 410 F.3d 1100, 1103 (9th Cir. 2005) as support. *Id.* He argued that "the offense of murder-for-hire "is complete" once the defendant engages in the charged *actus reus* element with the requisite intent to commit murder-for-hire. *Id.* at 181-183. Mr. Gessen requested the venue instruction because the jury could find that the

murder-for-hire offense "was completed in another judicial district (e.g., the District of Massachusetts, the Southern District of New York, or the Southern District of Florida) and, therefore, venue is not proper here." *Id.  Hernandez*, 189 F.3d at 790.

Here, the charged offense "was begun in one district and completed in another, or committed in more than one district."  18 U.S.C. § 3237(a).  The applicable venue statute provides that venue lies "in any district in which such offense was begun, continued, or completed." *Id*. *Hernandez*, 189 F.3d at 788.  2-ER-182.  The determination of when an offense was completed "provide[s] a limit on where venue may lie." *Id.* at 790.  However, "venue is not properly established via facts or conduct occurring after the crime is completed. *See e.g., id.* at 790-91; *United States v. Lopez*, 484 F.3d 1186, 1194 (9th Cir. 2007) (en banc) ("[V]enue lies in any district touched by the crime before the crime is completed.")." 2-ER-183-184.

Mr. Gessen claimed "that *if* any crime was committed in this case, that crime was begun and completed in a judicial district other than this one."  2-ER-184.  He added that the jury "must determine whether the offense, if any, was actually committed in this judicial district—or whether it was completed elsewhere." *Id.*

70

The modification to the venue instruction added two sentences:

> For you to return a verdict of guilty the government must prove that the offense was begun, continued, or completed in the Northern District of California.

> When considering whether the government has established that venue is proper in the Northern District of California, you may not consider acts that occurred after the offense was completed.

2-ER-186. Mr. Gessen relied on *Driggers*, 559 F.3d at 1024; *Delpit*, 94 F.3d at 1150-51; *Hernandez*, 189 F.3d at 790-91; and *United States v. Pace*, 315 F.3d 344, 348-51 (9th Cir. 2002) as authority for the modification. *Id.*

The court noted: "Certainly the jury could find that the offense was continued by the payment of the money for the alleged murder for hire. Right?" 7-ER-1261. Counsel responded:

> Yes, Your Honor, which actually could have been in New York, which is where Mr. Gessen is alleged to have given a gold coin to undercover Agent Rizzo as payment. So at that point in time, based off of the case law, because Mr. Gessen gave the gold coin to Agent Rizzo under the government's theory with the intent that the murder for hire be completed, that would have completed all of the evidence required for the statute.

*Id.*

In the end, the court held: "I would make the argument, if I were in your place, but I'm not going to accept the argument. I don't think it's actually what the law would be. But, the argument is preserved." 7-ER-1263.

71

The court gave "the Ninth Circuit venue instruction as well as the preponderance of the evidence instruction, as well." 7-ER-1259-1263. Later, Mr. Gessen asked that the first sentences of instruction 6.32 be modified as follows:

> "Venue is proper in the Northern District of California if the charged offense was committed in this district."
>
> . . .
>
> "The indictment alleges that the crime charged was begun, continued or completed in the Northern District of California."

*Id.* at 1265.

The court determined that the modification could be confusing by adding what the statute, itself, reads. "But if to instruct the jury on the statute, itself, would be confusing or misleading, then we don't -- then we don't do it." 7-ER-1270. Counsel responded: "And so we would just request that the Court include that language, because it is the accurate statement of what the law is." *Id.*

The court denied the request and instructed the jury without the modification. 7-ER-1277-1278. The court erred. The jury should have been instructed according to the defense theory. *Escobar de Bright,* 742 F.2d. at 1198.

### 2.    The Trial Court Erred in Denying a New Trial.

Mr. Gessen also argued that the government failed "to prove venue was proper in the Northern District of California." 2-ER-181. Later, Mr. Gessen filed

72

a pro se motion for acquittal alleging: "As argued at trial, venue here was improper. The evidence introduced at trial was insufficient to establish that any 'essential conduct element' of the charged crime occurred in the Northern District. *United States v. Auernheimer*, 748 F.3d 525, 532 (3d Cir. 2014)." 2-ER-118; *United States v. Ghanem*, 993 F.3d 1113, 1119 (9th Cir. 2021); Fed. R. Crim. P. 18. See Argument I-1.

Here, the offense was committed and completed prior to the money transfers on June 29 and July 8, 2022. The essential elements were Mr. Gessen's *travel* with the requisite intent, or his *use* of an interstate-commerce facility with the requisite intent. *See United States v. Linehan*, 56 F.4th 693, 707 (9th Cir. 2022); *Delpit*, 94 F.3d at 1150. Accordingly, here, the alleged murder-for-hire occurred in Florida, Massachusetts, or New York. No "essential conduct element" took place in the Northern District of California.

According to Rizzo, Mr. Gessen was traveling to meet him, conversing on Signal about the murder-for-hire, and making a down payment with a gold coin—all of which proved the offense was completed well before the June and July bank transfers occurred. The evidence at trial plainly demonstrates that the overwhelming majority of the essential conduct took place outside of California. Thus, if murder-for-hire was committed, it was begun and completed in a judicial

district other than the Northern District.  The jury therefore could not have found that the offense was actually committed.

The court denied the motion.  2-ER-26-28.  The court erred.  Once Mr. Gessen engaged in interstate commerce with the alleged intent, the crime was completed.  And, that occurred long before the money landed in San Francisco.

### J.      The Cumulative Errors Require Reversal

Reversal is required due to the insufficiency of the evidence, to the individual errors made in this case and due to the cumulation of errors.  *Cooper v. Sanders*, 837 F.2d 284, 288 (7th Cir. 1988); *United States v. Necoechea*, 986 F.2d 1273, 1280 (9th Cir. 1993).

## VIII.  CONCLUSION

Mr. Gessen's conviction should be reversed.

DATED: September 17, 2025          Respectfully Submitted,

                                                             */s/ James S. Thomson*

                                                             _____
                                                             JAMES S. THOMSON
                                                             Attorney for Defendant-Appellant
                                                             ALLEN GESSEN

## STATEMENT OF RELATED CASES

Counsel for Mr. Gessen is not aware of any related cases pending before this Court.

DATED: September 17, 2025          Respectfully Submitted,

*/s/ James S. Thomson*

 

JAMES S. THOMSON
Attorney for Defendant-Appellant
ALLEN GESSEN

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 24-2979

I am the attorney or self-represented party.

**This brief contains** 13,966 **words, including** [          ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

( ● ) complies with the word limit of Cir. R. 32-1.

( ○ ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ○ ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ○ ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ○ ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.

[ ] a party or parties are filing a single brief in response to multiple briefs.

[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ○ ) complies with the length limit designated by court order dated [          ].

( ○ ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** /s/ James Thomson   **Date** September 17, 2025

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* *forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*